## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **B.R.** by her Next Friend Nora El-Chaer; **L.T.** by his Next Friend S.T.; **A.B.** by his Next Friend C.B., for themselves and all others similarly situated; and **Advocates for Immigrant Rights**,<br><br>    **Plaintiffs,**<br><br><br>    **v.**<br><br>**Margie Quin,** in her official capacity as the Commissioner of the Tennessee Department of Children's Services,<br><br>    **Defendant.** | Case No. _____ |

## CLASS ACTION COMPLAINT FOR INJUNCTIVE
## AND DECLARATORY RELIEF

## NATURE OF THE CASE

1.      Immigrant children in the custody of the Tennessee Department of Children's Services ("DCS") are some of the most vulnerable children in the state. Many of these children fled their home countries to escape from abuse, human rights atrocities, trafficking, and other violence. In addition to these traumas, many risked their lives on their journeys to the United States—traversing thousands of miles by foot, bus, and train to find safety. Hoping for safe harbor and protection, some immigrant children instead have endured additional hardships in federal immigration detention, after being released to family members in Tennessee communities, and while in DCS custody. Regardless of their path to Tennessee, these children remain vulnerable without legal immigration status, barred from employment, healthcare, and many services, and are at constant risk of being detained or removed from the country.

2.      This action concerns immigrant children taken into DCS custody following a juvenile court determination that they have been abused or neglected. When DCS takes custody of a child, including immigrant children, it must provide for their "care, protection, training and education," as well as their "physical, mental and moral welfare." Tenn. Code § 37-1-140(a).

3.      For children in DCS custody without legal immigration status, DCS's care must include addressing and safeguarding their immigration-related needs, which impact their health, welfare, and safety. This care entails determining whether a child is in need of immigration-related services, ensuring that DCS considers immigration-related needs when helping the child plan for their future, and helping a child access needed services.

4.      The obligation of DCS to provide such support is critical because immigrant children in DCS custody who lack legal status are generally eligible for a form of federal immigration relief called Special Immigrant Juvenile Status (SIJS). SIJS was created by Congress to provide humanitarian protection for abused, neglected, or abandoned child

1

immigrants eligible for long-term foster care—exactly the group of children in DCS's care—and to provide a pathway for them to obtain lawful permanent resident (LPR) status and United States citizenship. For children in Tennessee, the SIJS process must begin before a child turns 18; otherwise, the opportunity is lost forever. As the children's legal guardian, DCS is uniquely positioned to access the necessary documents and information to pursue this form of relief, and often has custody of the children during the only time period when they are able to start the process. DCS has a duty to support children pursuing this legal pathway as quickly as possible, and certainly before children turn 18 and the door to SIJS is closed forever.

5.      Immigrant children without legal status in DCS's care have a constitutionally protected interest in applying for SIJS. SIJS is a non-discretionary right that provides these children with access to many benefits that they would not have otherwise, including access to federal funds, protection from removal, and a path to citizenship. Far from safeguarding immigrant children's access to SIJS, DCS has engaged in a pattern and practice of obstructing children's pathway to SIJS.

6.      Currently, DCS has no policies or procedures to identify youth eligible for SIJS. It consistently fails to address the immigration-related needs of these children when it purports to plan for their futures. And, it does not provide immigration-related services to ensure that eligible youth have the opportunity to apply for SIJS.

7.      Like all children in DCS custody, immigrant children are entitled to the opportunity to "reach their full potential as productive, competent and healthy adults." Tenn. Code § 37-5-102(a). DCS is aware that for immigrant children in its custody, this opportunity requires taking steps to become a legal resident. In fact, its own Independent Living Handbook, provided to older youth preparing to transition out of DCS's care, advises that they do just that.

2

But due to DCS's failures, many immigrant children age out of DCS custody in a far worse position than they entered—having lost their most promising opportunity to become a U.S. citizen. As a result, these youth are at an increased risk of being deported.

8.     This civil rights action seeks declaratory and prospective injunctive relief on behalf of Named Plaintiffs, youth B.R., L.T., and A.B., through their Next Friends, and a class of similarly situated immigrant youth in Tennessee DCS custody ("the Putative Class" or "the Class"), as well as Organizational Plaintiff Advocates for Immigrant Rights ("AIR"), for violations of the Due Process Clause of the Fourteenth Amendment of the United States Constitution by Defendant Margie Quin, acting in her official capacity as Commissioner of DCS.[1]

## JURISDICTION AND VENUE

9.     This action is brought under 42 U.S.C. § 1983 because Defendant, acting under color of state law, has deprived Plaintiffs, and the Class members they represent, of rights secured by the United States Constitution.

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (civil rights jurisdiction).

11.     Venue is proper in this District under 28 U.S.C. § 1391(b). Defendant is sued in her official capacity and performs her official duties by and through offices within the District, and a substantial part of the events and omissions giving rise to the claims herein occurred in this District. For example, Named Plaintiffs B.R. and L.T. reside in this District. Further, AIR routinely serves clients in this District.

---

[1] Due to the highly sensitive nature of the issues in this case, Named Plaintiffs will be filing a motion for leave to proceed using pseudonymous initials.

3

## PARTIES

### I.   NAMED PLAINTIFFS

#### A.   Plaintiff B.R.

12.    B.R. is a 15-year-old girl currently in the custody of DCS.

13.    B.R. was born in Guatemala and is a citizen of Guatemala.

14.    In November 2021, B.R. entered the United States as an unaccompanied minor. She was initially taken into the custody of the federal Office of Refugee Resettlement, then released to the care of her uncle in Maryland. She subsequently moved to Tennessee to live with relatives.

15.    In October 2022, Tennessee Child Protective Services began an investigation into B.R.'s living situation. She was pregnant at the time and subsequently gave birth to her child.

16.    In November 2022, the juvenile court in Nashville entered an order finding that there was an immediate threat of harm to B.R. and placed B.R. in DCS custody. The juvenile court appointed Nora El-Chaer as B.R.'s guardian ad litem.

17.    DCS served a petition on all parties alleging that B.R. is a dependent and neglected child.

18.    DCS placed B.R. and her baby in a foster home outside of Nashville, where they are currently living. DCS's permanency plan for B.R. is long-term foster care. Meanwhile, B.R. is attending high school. It is not in B.R.'s best interests to return to Guatemala due to safety concerns and abandonment by her parents. She wishes to remain in the United States with her child and become a U.S. citizen.

19.    Based on B.R.'s factual circumstances, she is likely eligible for SIJS. B.R. meets the requirements for SIJS because she has been found dependent on the state juvenile court,

4

reunification with her parents is not viable because of abandonment, and it is not in her best interests to return to Guatemala.

20.     Despite knowledge that B.R. is a recent immigrant who does not yet have legal immigration status, DCS, her legal guardian, fails to have policies and procedures to address B.R.'s immigration-related needs. As a result, DCS has not assisted her with obtaining any forms of immigration relief. DCS has not informed B.R., her guardian ad litem, or her foster parent about her immigration-related needs or her likely eligibility for SIJS. And, DCS has not filed any petitions for immigration relief on B.R.'s behalf. DCS's on-going failure to have policies and procedures to address the immigration-related needs of B.R. and other similarly situated children in DCS custody places B.R. at on-going risk of harm.

21.     Since B.R.'s entry into the foster system, both B.R.'s guardian ad litem and her foster parent have contacted DCS multiple times to seek help with addressing B.R.'s immigration-related needs. They have received no substantive response. DCS staff either stated that they had no knowledge of the situation or that they would look into it, but then failed to follow up.

22.     Without obtaining immigration relief through SIJS, B.R. is ineligible for many public benefits, including forms of healthcare coverage, student financial aid, and public assistance. She also cannot access extended foster care when she turns 18, obtain authorization to work legally, or obtain a driver's license. She remains at risk of being detained or removed from the country and separated from her baby, who is a U.S. citizen.

23.     B.R. has received a notice to appear in immigration court, indicating that the federal government may schedule a removal hearing against her. DCS has taken no steps to monitor this removal case against B.R. or to ensure that her family and attorney are aware of the

status of this case. If B.R. is summoned to appear in immigration court, she risks missing hearings or being unprepared for a hearing, which could result in her detention or removal from the country.

24.    B.R. brings this action through her Next Friend, Nora El-Chaer.

25.    Ms. El-Chaer is familiar with the facts of B.R.'s case as well as the harms and risks of harm B.R. has suffered while in DCS's custody. She is dedicated to serving B.R.'s best interests in this litigation.

**B.    Plaintiff A.B.**

26.    A.B. is a 14-year-old boy currently in the custody of DCS.

27.    A.B. was born in Honduras and is a citizen of Honduras.

28.    A.B. came to the United States about six years ago with his sister.

29.    In 2017, Tennessee Child Protective Services investigated A.B.'s living situation. He was found living alone in a trailer with his siblings with no food, running water, or utilities. A.B. came into DCS custody due to allegations of abandonment and neglect.

30.    Subsequently, A.B. was adjudicated a dependent child due to abuse and neglect, and placed in a foster home in Knoxville.

31.    DCS's permanency plan for A.B. is permanent guardianship or adoption. In February 2023, A.B. was placed with his current foster family. He has been doing well in this placement. He has been attending high school and has recently gone on summer vacation with his foster family. A.B. hopes to be able to have a part-time job and get a driver's license someday, just like other teenagers. It is not in A.B.'s best interests to return to Honduras because he has no known family members there. He wishes to remain in the United States and become a U.S. citizen.

6

32. Based on A.B.'s factual circumstances, he is likely eligible for SIJS. A.B. meets the requirements for SIJS because he has been found dependent on the state juvenile court, reunification with his parents is not viable because of abandonment, abuse and/or neglect, and it is not in his best interests to return to Honduras.

33. Despite knowledge that A.B. is an immigrant who does not yet have legal immigration status, DCS, his legal guardian, fails to have policies and procedures to address A.B.'s immigration-related needs. As a result, DCS has not assisted him with obtaining any forms of immigration relief. DCS has not assisted A.B. or his foster parent with his immigration-related needs or educated them about his likely eligibility for SIJS. And, DCS has not filed any petitions for immigration relief on A.B.'s behalf. DCS's on-going failure to have policies and procedures to address the immigration-related needs of A.B. and other similarly situated children in DCS custody places A.B. at on-going risk of harm.

34. A.B.'s foster parents have asked DCS multiple times for help with addressing A.B.'s immigration-related needs, to no avail. In response, DCS staff has repeatedly tried to place the responsibility for meeting A.B.'s immigration-related needs on his guardian ad litem. A.B.'s foster parents have made numerous inquiries among their networks in an attempt to find help for A.B., but in the absence of assistance from DCS, these efforts have not been successful.

35. Without obtaining immigration relief through SIJS, A.B. is ineligible for many public benefits, including forms of healthcare coverage, student financial aid, and public assistance. He also cannot access extended foster care when he turns 18, obtain authorization to work legally, or obtain a driver's license. He remains at risk of being detained or removed from the country.

36. Because he continues to lack legal status, A.B. could also be summoned to appear

in immigration court for a removal hearing at any time. A.B. does not have an attorney to defend him in a removal hearing. On information and belief, DCS has taken no steps to monitor whether a removal case has been initiated against A.B. If A.B. is summoned to appear in immigration court, he risks missing hearings or being unprepared for a hearing, which could result in A.B.'s detention or removal from the country.

37.     A.B. brings this action through his foster parent and Next Friend, C.B.

38.     C.B. is familiar with the facts of A.B.'s case as well as the harms and risks of harm A.B. has suffered while in DCS's custody. She is dedicated to serving A.B.'s best interests in this litigation.

**C.      Plaintiff L.T.**

39.     L.T. is an 11-year-old boy currently in the custody of DCS.

40.     L.T. was born in Honduras and is a citizen of Honduras.

41.     L.T. came to the United States with family members when he was about five years old.

42.     L.T. entered DCS custody in November 2021 after his biological mother abandoned him at a hospital.

43.     In May 2022, DCS placed L.T. with his current foster mother, S.T., and her husband, with whom he currently resides.

44.     When DCS contacted S.T. seeking placement for L.T., the DCS case manager had no knowledge or information about L.T.'s immigration-related needs or how his immigration status impacted his placement. Because L.T. needed placement immediately, S.T. and her husband agreed to care for him. For the past year, he has been thriving in their home.

45.     Based on L.T.'s factual circumstances, he is likely eligible for SIJS. L.T. meets

8

the requirements for SIJS because he has been found dependent on the state juvenile court, reunification with one of his parents is not viable because of abandonment, and it is not in his best interests to return to Honduras.

46.     Despite knowledge that L.T. is an immigrant child who does not yet have legal immigration status, DCS, his legal guardian, fails to have policies and procedures to address L.T.'s immigration-related needs. As a result, DCS repeatedly ignored his foster mother's requests for information about his immigration-related needs, causing unnecessary delays in the SIJS process. These delays have led to challenges in L.T.'s ability to access health services, and have impeded S.T. in her own efforts to obtain immigration relief for L.T. DCS's on-going failure to have policies and procedures to address the immigration-related needs of L.T. and other similarly situated children in DCS custody places L.T. at on-going risk of harm.

47.     When S.T. attempted to communicate with DCS about L.T.'s immigration-related needs, DCS either failed to respond to her at all or told her that they did not know anything about it. Months would pass by with no visitation from a DCS case manager or response to requests for assistance. DCS's lack of training, knowledge, and support of L.T.'s immigration-related needs has resulted in L.T. being denied access to needed services, such as healthcare, translation services, and legal services.

48.     For example, on information and belief, DCS has failed to pay L.T.'s healthcare bills in a timely manner. Because L.T. is not eligible for TennCare due to his immigration status, DCS must pay for L.T.'s healthcare services directly. When S.T. took L.T. to the dentist for a scheduled appointment in August 2022, the dentist refused to treat him until DCS paid an outstanding balance of $1,400 that had remained unpaid for months. Despite months of inquiries by S.T., DCS did not pay this bill until January 2023, resulting in delayed access to healthcare.

9

Since then, DCS has failed to pay other bills, resulting in continued difficulties for L.T. and S.T.

49.     DCS has also failed to provide a Spanish-language interpreter for L.T.'s supervised visits with his birth mother, even though interpretation is necessary for supervision. S.T. has had to find interpretation elsewhere, despite this not being the responsibility of a foster parent.

50.     After DCS failed to take any steps to secure an immigration attorney for L.T., S.T. began conducting her own research about L.T.'s immigration-related needs. Through her research, S.T. learned about the possibility of applying for SIJS immigration relief for L.T. When S.T. asked DCS about SIJS, DCS staff had no knowledge of the program. DCS staff told S.T. that she was welcome to pursue this immigration relief for L.T. on her own. S.T. has independently retained an immigration attorney to work on L.T.'s SIJS case pro bono.

51.     DCS has impeded S.T.'s attempts to help L.T. obtain immigration relief by failing to timely provide essential documents and by incorrectly recording L.T.'s birth date when he came into their custody then failing to address the error, which is likely to cause continued difficulties in L.T.'s immigration case.

52.     Because he continues to lack legal status, L.T. could also be summoned to appear in immigration court for a removal hearing at any time. L.T. does not have an attorney to defend him in a removal hearing, which is separate from the affirmative SIJS application. DCS has taken no steps to monitor whether a removal case has been initiated against L.T. If L.T. is summoned to appear in immigration court, he and his foster family risk missing hearings or being unprepared for a hearing, which could result in L.T.'s detention or removal from the country.

53.     L.T. brings this action through his Next Friend, S.T. S.T. is L.T.'s current foster

parent and has cared for him for over a year.

54.     S.T. is familiar with the facts of L.T.'s case as well as the harms and risks of harm L.T. has suffered while in DCS's custody. She is dedicated to serving L.T.'s best interests in this litigation.

## II.     ORGANIZATIONAL PLAINTIFF

55.     Advocates for Immigrant Rights (AIR) is a non-profit law firm located in Memphis, Tennessee.

56.     AIR's mission "is to fight for the dignity, safety, and inclusion of immigrants in the United States, especially those most marginalized, through legal representation and advocacy."[2] AIR provides affordable legal services, as well as non-legal support services, to immigrants. AIR's legal practice focuses primarily on removal defense, but the firm also represents individuals filing affirmative applications for immigration status. AIR represents people of all ages and family situations, including children and youth in the foster system, who are eligible to apply for SIJS.

57.     In recent years, AIR has provided immigration legal assistance to children in DCS custody. AIR learns of foster youths' cases from various sources, including parents, foster parents, community members, and guardians ad litem. Many youth in need of immigration legal services come to AIR's attention when the youth are close to aging out of foster care, necessitating immediate action in order to have any chance of obtaining SIJS relief. AIR has also encountered youth who have aged out of DCS custody without ever obtaining SIJS relief, thus losing access to that immigration status pathway forever.

58.     AIR receives funding from several sources, including grants. These grants have

---

[2] Advocates for Immigrant Rights, https://www.airlegal.org/ (last visited July 21, 2023).

performance requirements that must be met, not only to maintain the grant, but also to have the potential of obtaining future funding support. AIR's ability to achieve its mission and continued viability depend on these funding sources.

## III. DEFENDANT

59.     Defendant Margie Quin, sued in her official capacity, is the Commissioner of the Tennessee Department of Children's Services (DCS).

60.     DCS is the state agency tasked with "provid[ing] timely, appropriate and cost-effective services for children in state custody and at risk of entering state custody." Tenn. Code § 37-5-102(a).

61.     As the Commissioner of DCS, Defendant Quin has "general responsibility for the proper and efficient operation of the department, its services and programs." *Id.* § 37-5-105(6). She has the power to "[m]ake and adopt rules, regulations and policies for the government, management and supervision of state children's service agencies . . . and provide for the care of children served by the department." *Id.* § 37-5-105(3).

62.     The principal office of DCS is located at 315 Deaderick Street, UBS Tower, 10th Floor, Nashville, Tennessee 37238.

## STATEMENT OF FACTS

## I. BACKGROUND

### A. Special Immigrant Juvenile Status

63.     Special Immigrant Juvenile Status (SIJS) is an immigration classification created by Congress in 1990 to provide humanitarian protection for abused, neglected, or abandoned child immigrants eligible for long-term foster care, and provide a pathway for them to obtain

lawful permanent resident (LPR) status and United States citizenship.[3]

64.     SIJS is available for a noncitizen child present in the United States who:

a.     "has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law," 8 U.S.C. § 1101(a)(27)(J)(i);

b.     "for whom it has been determined in administrative or judicial proceedings that it would not be in the [child's] best interest to be returned to the [child's] or parent's previous country of nationality or country of last habitual residence," *id.* § 1101(a)(27)(J)(ii); and

c.     "in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status," *id.* § 1101(a)(27)(J)(iii).

65.     It is common practice for attorneys representing potentially SIJS-eligible children in state juvenile court dependency or similar state proceedings to request findings from the juvenile court regarding whether it would be in the child's best interest to be removed from the United States. The juvenile court judge typically makes such findings in the dependency order, called a "SIJS Predicate Order."

66.     In Tennessee, a child must obtain a SIJS Predicate Order from the juvenile court before turning 18 years old to obtain SIJS. This is because Tennessee juvenile court jurisdiction

---

[3] *See* 6 USCIS Policy Manual, Pt. J, Ch. 1, https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-1.

13

ends once an individual turns 18, except for in certain circumstances generally inapplicable to youth in the Class. *See* Tenn. Code § 37-1-102(b)(5).

67. Obtaining a SIJS Predicate Order is key for foster youth who do not have legal immigration status. Once a child has a SIJS Predicate Order, the child can file a SIJS petition with United States Citizenship and Immigration Services (USCIS) seeking recognition as a Special Immigrant Juvenile.

68. Applying for SIJS confers many benefits. A pending SIJS application allows a youth to access certain benefits, such as the use of the federal health insurance marketplace.[4] In contrast, before they obtain SIJS, immigrant children in foster care without legal status are ineligible for certain forms of health care coverage. For example, immigrant children without legal status are ineligible for medical care coverage, except emergency care and childbirth services, and are not eligible for health care benefits through the Affordable Care Act.

69. An approved SIJS petition confers further critical benefits. Once approved, youth with SIJS are "deemed . . . to have been paroled into the United States." 8 U.S.C. § 1255(h)(1). Moreover, the Immigration and Nationality Act (INA) automatically exempts youth with SIJS from several types of inadmissibility that would otherwise prevent them from becoming a LPR. *See id.* § 1255(h)(2)(A). These waivers of inadmissibility reflect Congress's intent that children with SIJS are not considered priorities for immigration enforcement.[5]

---

[4] *See* HealthCare.gov, *Immigration status and the Marketplace*, https://www.healthcare.gov/immigrants/immigration-status/ (last visited July 21, 2023); Division of TennCare Families and Children Manual No. 005.015, Qualified Non-Citizens (May 2, 2022) at 3, https://www.tn.gov/content/dam/tn/tenncare/documents/QualifiedNon-Citizens.pdf (children with a pending SIJS petition are eligible for the federally facilitated marketplace (FFM) but unable to receive TennCare Medicaid or CoverKids benefits.).

[5] *See* USCIS Policy Alert PA-2022-10 (Mar. 7, 2022), *Special Immigrant Juvenile Classification and Deferred Action*, https://www.uscis.gov/sites/default/files/document/policy-manual-

14

70.     One of the types of inadmissibility that is waived for youth with SIJS is the public charge provision. 8 U.S.C. § 1182(a)(4). This is particularly important for youth in DCS custody because, without SIJS, the very fact that they have been separated from their family could contribute to a finding that they are ineligible for a visa.

71.     An approved SIJS petition also allows a young person to obtain a work permit and identification.[6] These documents are critical to the wellbeing of a young person, especially once they exit foster care. Without a work permit, young people may be unable to provide for themselves financially, or else be forced to accept unauthorized jobs in which they are easily exploited and underpaid.

72.     Additionally, youth with SIJS may receive various forms of support within the United States, such as access to federally funded educational programming, and preferential status when seeking employment-based visas.[7] See 8 U.S.C. §§ 1232(d)(4)(A), 1153(b)(4).

73.     SIJS also allows youth to qualify for extended foster care services when they would otherwise age out of foster care.[8] These benefits for certain young adults ages 18 through 21 include education and training vouchers of up to $5,000 per year; placement support or an

---

updates/20220307-SIJAndDeferredAction.pdf. ("In general, SIJs are unlikely to be enforcement priorities as evidenced by the broad waivers of inadmissibility Congress established. . . ."); *ICE Directive 11005.3: Using a Victim-Centered Approach with Noncitizen Crime Victims* (Aug. 10, 2021), at 2, https://www.ice.gov/doclib/news/releases/2021/11005.3.pdf (stating that absent exceptional circumstances, ICE defers enforcement actions against SIJs until USCIS adjusts a child's status to that of a LPR).

[6] *See* USCIS Policy Alert PA 2022-10 (Mar. 7, 2022), *Special Immigrant Juvenile Classification and Deferred Action*, at 2, https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf.

[7] *See also* USCIS Policy Alert PA-2022-10 (Mar. 7, 2022), *Special Immigrant Juvenile Classification and Deferred Action*, https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20220307-SIJAndDeferredAction.pdf.

[8] *See* Tenn. Dep't of Child. Serv., Administrative Policies and Procedures 16.52, https://files.dcs.tn.gov/policies/chap16/16.52.pdf.

15

independent living allowance; independent living wrap services; access to life skills classes and leadership opportunities; and support from a child and family team, family service worker, and court representatives. While Extension of Foster Care benefits are optional for the youth, DCS offers them because "DCS wants to assist in the transition in order for . . . youth and young adults to become more confident, productive individuals in society and achieve lifelong success."[9] In fact, DCS provides these services because it believes "18 is too young for someone to be on their own."[10]

74. Nationally, youth who access these services experience better outcomes than youth who age out of foster care at 18. For example, youth who age out of foster care at age 18 are less likely to graduate high school, less likely to be employed, more likely to be homeless, and more likely to become involved with the criminal legal system. By contrast, young adults who have the benefit of extended foster care tend to experience better outcomes: they are more likely to be employed and enroll or stay enrolled in school, and less likely to become young parents. They are also more likely to be connected to services critical for their successful transition to adulthood. Youth who receive extended foster care benefits are more likely to have additional funds in their bank accounts, less likely to experience food insecurity, and more likely to feel that they have enough people to turn to for social support.

75. The benefits conferred by SIJS also include the ability to apply for lawful permanent resident (LPR) status. 8 U.S.C. § 1255(h). LPR status is the most stable legal status short of citizenship. An LPR may live permanently in the United States without being subject to

---

[9] *Id.*
[10] *Id.* at l.

the risk of detention and removal. By contrast, people who lack legal status, including children, are at risk of being detained and removed at any time.

76.     LPR status confers many benefits. An LPR may obtain lawful employment, qualify for federal student aid, and travel internationally and return to the United States. A new LPR may also become eligible for public benefits such as Supplemental Security Income (SSI), Supplemental Nutrition Assistance Program (SNAP), federal Medicaid, Temporary Assistance to Needy Families (TANF), and the Child Health Insurance Program (CHIP) after five years. At age 18 and after five years of being an LPR, a youth may also apply for naturalization and continue their path to United States citizenship. The sooner the five-year period begins, the sooner the youth will have access to critical resources and benefits. People who lack legal status are denied access to these essential activities and benefits.

77.     SIJS may be the only chance many immigrant children have to obtain LPR status.

78.     If a child without legal status in Tennessee does not obtain a SIJS Predicate Order before turning 18, despite having been eligible for SIJS, that child permanently loses the chance to obtain SIJS. Even if a child obtains a SIJS Predicate Order, they must still file a SIJS petition before turning 21. Otherwise, they will lose their chance to obtain SIJS.

79.     Finally, SIJS is not a discretionary benefit. Once granted, it may not be revoked except "on notice," 8 C.F.R. § 205.2, and upon the Government's compliance with a series of procedural safeguards: The Secretary of Homeland Security must find "good and sufficient cause" for revocation; the agency must provide notice of intent to revoke; and the individual with SIJS must be given the opportunity to present evidence opposing revocation.[11] *See* 8 U.S.C. §

---

[11] *See also* 7 USCIS Policy Manual, Pt. F, Ch. 7, available at https://www.uscis.gov/policy-manual/volume-7-part-f-chapter-7.

1155; 8 C.F.R. § 205.2. The individual with SIJS also has the right to appeal any adverse ruling, initially to the Associate Commissioner for Examinations, and then to the extent the child claims he or she "suffer[ed] legal wrong because of agency action," to the federal courts. *See* 8 C.F.R. § 205.2(d); 5 U.S.C. § 702.

80.     Additionally, when an application is denied, the government officer is required to "explain in writing the specific reasons for denial." 8 C.F.R. § 103.3(a)(1)(i). Any unfavorable decision may be appealed. *Id.* § 103.3(a)(1)(ii); *id.* § 204.11(h).[12]

**B.     The Tennessee Foster Care System**

81.     Under Tennessee law, a "dependent and neglected child" includes children who are without a parent or legal guardian, are neglected by their parent or guardian, suffer from abuse, or are endangered by improper guardianship. *See* Tenn. Code § 37-1-102(b)(13).

82.     If a Tennessee juvenile court finds a child to be dependent and neglected, that court may transfer temporary legal custody or grant permanent guardianship of the child to DCS. *Id.* § 37-1-130(a)(2)(B).

83.     According to the most recent publicly available data, there were 14,808 children in DCS custody in State Fiscal Year 2021 – 2022, with 13,401 children adjudicated dependent and neglected.[13]

---

[12] *See also* 6 USCIS Policy Manual, Pt. J, Ch. 4, available at https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-4; *id.* at Ch. 5, available at https://www.uscis.gov/policy-manual/volume-6-part-j-chapter-5.

[13] Tenn. Dep't of Child. Serv. Tennessee Annual Report, State Fiscal Year July 2021 – June 2022 (Jan. 2023) at 38, https://www.tn.gov/content/dam/tn/dcs/documents/quality_improvement/annual-reports/AnnualReport_2021-2022.pdf.

18

84. For children placed in its legal custody, DCS "has the right to the physical custody of the child . . . and the right and duty to provide for the care, protection, training and education, and the physical, mental and moral welfare of the child." Tenn. Code § 37-1-140(a).

85. The stated purpose of DCS's services is to allow children in its care to "reach their full potential as productive, competent and healthy adults." Tenn. Code § 37-5-102(a). Tennessee law states that "[i]n all cases, the services [provided by DCS] shall be to further the best interest of the child, and when appropriate, to preserve the relationship between the child and the family." *Id.* § 37-5-102(a); *see also id.* § 37-5-102(a)(5) ("For the children it serves, [DCS] shall strive to . . . [k]eep children safe.").

### C. Immigrant Children in Tennessee Foster Care

86. Over the last decade, Tennessee has had one of the fastest growing immigrant populations across the country. Since 2016, more than 16,000 unaccompanied children have been released from the federal Office of Refugee Resettlement to sponsors, typically family members, in Tennessee.[14] More than half of those children have been released since 2020.[15]

87. Children in DCS custody who lack legal immigration status face the intersecting stresses of navigating the state's foster care system and the federal immigration system. These youth typically have already fled abuse, neglect, and violence in their home country. They often crossed continents by foot, by bus, or on the tops of trains to seek safety in the United States, with many experiencing harm on their journey. Many have already experienced the trauma of

---

[14] U.S. Dep't of Health & Hum. Serv., Office of Refugee Settlement, *Unaccompanied Children Released to Sponsors By State* (last accessed on October 27, 2022), available at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state.
[15] *Id.*

19

being detained in federal immigration custody. Once released to family members, these youth often face language and educational barriers.

88.     By virtue of being in the foster care system, these youth have also typically experienced the trauma of being separated from their families in the United States. The foster system then often shuffles them between multiple out-of-home placements, depriving them of a critical sense of stability, permanency, and safety. Because they are excluded from federal adoption assistance funding, immigrant youth who lack legal immigration status are less likely to find permanent homes through guardianship or adoption, and therefore are more likely to age out of foster care than non-immigrant youth.

89.     DCS is aware of the special challenges facing these youth. DCS's Independent Living Handbook states that any foster youth who has not yet applied for immigration status "should start the paperwork to establish [themselves] as a legal resident."[16] The Handbook warns that "[n]ot being a resident makes it hard to get a job or pay for school. Immigrants who don't have lawful status are not eligible for some government services such as TennCare and could be deported. The application process is long, so apply early."[17] The Independent Living Handbook continues, "[i]f you live in the United States, but are not a legal citizen or [LPR] and are in the foster care system, you or your case manager should have applied for [SIJS] for you. This status lets you stay in the United States permanently after you leave foster care."[18] Despite knowledge of the importance of SIJS, DCS has no policies or procedures in place to ensure eligible youth in its custody are able to timely seek SIJS.

---

[16] Tenn. Dep't of Child Serv., Independent Living Handbook, Getting Legal Help—Immigration (2016) at 46, https://files.dcs.tn.gov/policies/chap16/ILHandbook.pdf.
[17] *Id.*
[18] *Id.*

## II. DCS'S POLICIES AND PROCEDURES FAIL TO MEET THE NEEDS OF IMMIGRANT CHILDREN IN TENNESSEE FOSTER CARE AND DEPRIVE THEM OF THEIR PROTECTED INTEREST IN APPLYING FOR SIJS

### A. DCS fails to consider children's critical immigration-related legal needs in its policies and procedures.

90.     DCS is responsible for administering federal funding through Titles IV-B and IV-E of the Social Security Act, the Child Abuse Prevention and Treatment Act, and the Chafee Foster Care Independence Program.

91.     Federal law obligates any state receiving federal funding for foster care and adoption assistance programs to have procedures to verify the citizenship or immigration status of each child in foster care. 42 U.S.C. § 671(a)(27). As the designated agency, DCS is legally required to keep track of the immigration status of children in its custody.

92.     DCS has a comprehensive child welfare information system, called the Tennessee Family and Child Tracking System ("TFACTS").[19] TFACTS is designed to track, among other things, the immigration status of youth in DCS care, and DCS is aware of this ability.[20] DCS's Child Welfare Benefits Unit's Policy and Procedures Manual (July 2017) instructs DCS staff to "[d]etermine whether the child meets Citizenship and Qualified Alien Status requirements."[21] This is for the stated purpose of determining whether the child is "eligible for Title IV-E Foster Care," *not* whether the child has immigration-related needs that must be addressed.[22] Upon

---

[19] Tenn. Dep't of Child. Serv., Child and Family Service Plan 2020 – 2024, at 24, https://www.tn.gov/content/dam/tn/dcs/documents/quality_improvement/cfsr/TN_Child_Family _Service_Plan%202020-2024.pdf.

[20] Tenn. Dep't of Child. Serv., State of Tennessee Permanency Plan Enhancement Training: Phase I, at 16 (May 2, 2016), https://files.dcs.tn.gov/oit/customercare/permplan/PermPlanTrain.pdf.

[21] Tenn. Dep't of Child. Serv., Child Welfare Benefits Unit Policy and Procedure Manual, at 15 (July 2017).

[22] *Id.* at 15. "Children who become Lawful Permanent Residents (LPRs) as Special Immigrant Juveniles are eligible for Title IV-E and Title IV-B of the Social Security Act . . . ." *Id.* at 15-16.

information and belief, DCS does not have any other system or procedure for identifying the immigration status of youth in foster care.

93.     Upon information and belief, in spite of DCS's legal requirement to keep track of the immigration status of children in its custody and its ability to do so, DCS does not track the immigration status or SIJS applications for youth in foster care. In April 2023, DCS admitted in response to a public records request that it did not keep records regarding how many children without legal status in its custody had received SIJS Predicate Orders. DCS similarly admitted it did not keep records on the number of children without legal status who exited DCS custody within the previous three years without first obtaining a SIJS Predicate Order. DCS also admitted that it did not keep records regarding whether DCS attorneys, or other attorneys not employed by DCS, represented children in seeking SIJS Predicate Orders.

94.     As of April 2023, DCS continued to lack any policies, training materials, guidance, or procedures on screening youth to determine eligibility for immigration relief.

95.     On information and belief, DCS also lacks policies and procedures to identify, document, and determine appropriate services for children who are or are at risk of being victims of sex trafficking, as required by federal law. *See* 42 U.S.C. § 671(a)(9)(C)(i)(I). If such policies and procedures were in place, DCS would be able to identify victims of sex trafficking, as well as victims of other types of trafficking, such as labor trafficking. DCS lacks such policies and procedures even though doing so could provide the child with additional options for immigration relief and access to critical public benefits.[23]

---

[23] *See, e.g.*, 8 U.S.C. § 1101(a)(15)(T) (T-Visas), (U) (U-Visas); 28 C.F.R. § 1100.35 (Continued Presence); *see also* USCIS, *Victims of Human Trafficking: T Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status (last updated Oct. 20, 2021).

96.     On information and belief, DCS also does not have policies and procedures to track the removal cases of youth in its custody, including whether they need to appear in immigration court or have been ordered removed.

97.     In addition to failing to track children's immigration status, DCS routinely fails to address these youth's immigration-related needs while in DCS custody. DCS recognizes and instructs case managers that, starting when the youth is 14 years old, "the immigration category must be addressed when the youth is undocumented . . . or the youth's status to remain legally in the U.S. is otherwise in doubt or in jeopardy."[24] However, on information and belief, DCS has no policies regarding the steps to be taken to address the immigration-related needs of youth in its custody and routinely fails to provide any assistance to youth in its custody on immigration matters before they begin transitioning to adulthood.

98.     DCS also fails to provide adequate immigration assistance to youth in its custody who are transitioning into adulthood, which is the last opportunity for youth without legal status to obtain SIJS. In its 2020-2024 Child and Family Service Plan, DCS asserts that "[t]ransition planning for all young people in DCS custody addresses Social Skills, Life Skills, Education, Housing, Employment, Essential Documents, Credit Check, Health, Finances, and Transportation. Additionally, special concerns including immigration and parenting are included in the transition planning process when appropriate."[25]

99.     DCS acknowledges that immigration planning should be provided when the youth turns 17 years old.[26] However, on information and belief, DCS routinely does not engage in

---

[24] Tenn. Dep't of Child. Serv., Family Permanency Plan Development Guide: A Resource for Case Managers, at 54 (Feb. 2021), https://files.dcs.tn.gov/policies/chap16/PPDevGuide.pdf.
[25] Child and Family Service Plan: 2020 – 2024, *supra* note 19, at 71.
[26] Tenn. Dep't of Child. Serv., Guide for Developing a Transition Plan for Youth Ages

immigration-related planning for youth in its custody until the youth is only a few months away from aging out of foster care. On information and belief, DCS also does not inform immigrant youth that their ability to receive extended foster care benefits depends upon their obtaining SIJS.

100.     In the absence of policies and procedures, DCS case managers rarely provide youth with helpful information about immigration issues. On information and belief, case managers often fail to explain immigration considerations in an age- and developmentally-appropriate manner, and in some cases, DCS even fails to provide immigration planning information in a language the youth can understand.

101.     On information and belief, as a result of a lack of policies and procedures, DCS's federally-mandated case plans for many immigrant children do not address immigration issues at all.

102.     For other youth, DCS's case plans contain a brief reference to immigration, but no concrete steps to be taken to monitor the youth's removal case or apply for time-sensitive immigration benefits.

103.     In other cases, DCS prepares a permanency plan stating that the youth will leave the United States and return to their home country upon exiting foster care, even when such a plan is against the youth's expressed wishes and plainly not in the youth's best interests.

**B.     DCS fails to train case managers to understand basic immigration issues impacting children in foster care.**

104.     States receiving federal funds under the John H. Chafee Foster Care Program for Successful Transition to Adulthood ("the Chafee program") must certify that they will provide

_____

17 and Up (IL Strengths and Concerns Sections of the Permanency Plan), at 10 (July 2015), https://www.tn.gov/content/dam/tn/dcs/documents/youthintransition/staff-info/GuideforDevTranPlanAge17.pdf.

training to help case managers "understand and address the issues confronting youth preparing for a successful transition to adulthood." 42 U.S.C. § 677(b)(3)(D).

105.    The purpose of the Chafee program is "to support all youth who have experienced foster care at age 14 or older in their transition to adulthood through transitional services." *Id.* § 677(a)(1).

106.    Upon information and belief, DCS case managers are generally unaware of the need to identify immigration-related concerns or the steps needed to address them and therefore do not timely identify these needs or take these steps. Neither DCS's Child and Family Service Plan nor its training plan have any indication that DCS trains its case managers to understand and address any immigration-related issues, including those that are critical for a successful transition to adulthood.[27]

107.    Federal law requires that youth aging out of foster care be provided with certain essential documents, including an official or certified copy of, if applicable, their U.S. birth certificate, social security card, health insurance information, medical records, and driver's license or other identification card. 42 U.S.C. § 675(5)(I). DCS maintains an Essential Documents Checklist, which states that "[a]mong the most necessary documents for transitioning young people are: State-issued identification card, Social Security card, Medical records, including immunization record, TennCare card and healthcare.gov information, Birth certificate, Religious documents and information, if applicable, Documentation of immigration or

---

[27] Child and Family Service Plan 2020 – 2024, *supra* note 19; *see also* Tenn. Dep't of Child. Serv., Appendix D: 2020, https://www.tn.gov/content/dam/tn/dcs/documents/quality_improvement/cfsr/AppxD_Training_Plan.pdf.

naturalization, if applicable, . . . Green card, if applicable, . . .Work permit, if needed."[28] DCS further states that "[b]est practice and policy make clear that young people transitioning from foster care must receive their essential documents or be supported in obtaining them."[29]

108.    An examination of these essential documents or a discovery that a youth does not have some of their essential documents, such as a U.S. birth certificate, would make the need for immigration planning apparent to a case manager with basic knowledge of immigration issues.

109.    In addition to being unaware of how to identify immigration issues, DCS case managers generally do not know the options and potential consequences facing immigrant youth who do not timely apply for immigration benefits. Without basic knowledge about the immigration-related needs of the youth in their care, DCS case managers often fail to take steps to address immigration-related needs in a timely manner, if at all. DCS case managers also fail to advise foster parents on the challenges youth in their care face accessing needed services, such as health care, translation, and immigration-related legal services.

110.    In addition, DCS case managers receive no training on the need to monitor potential removal cases against youth in their care, which can result in youth missing hearings and ultimately being removed from the country.

111.    When immigration-related needs are identified, often just before a child will age out, DCS case managers frequently ask staff at AIR or other non-profit organizations questions that evidence a lack of even basic knowledge about children's immigration-related needs.

112.    Different DCS representatives also ask AIR the same questions multiple times, which further delays each youth's application, and unnecessarily diverts AIR's resources from its

---

[28] Tenn. Dep't of Child. Serv., *Essential Documents Checklist*, https://www.tn.gov/dcs/program-areas/youth-in-transition/youth-resources/essential-documents-checklist.html.
[29] *Id.*

26

primary work of removal defense cases and other applications. These interactions between AIR and DCS, which can continue for months, evidence a lack of uniform training or procedures with respect to children's immigration-related needs within DCS.

113. Those children whom AIR is able to assist urgently are fortunate. However, many immigrant children who are entitled to SIJS are not identified until it is too late. As a result of DCS's failure to train case managers to identify and address immigration-related needs, immigrant youth in foster care often miss their opportunity to apply for immigration benefits before aging out of foster care, permanently closing the door to SIJS relief.

**C.   DCS routinely interferes with the timely submission and adjudication of SIJS applications without providing children under their care due process.**

114. Even when DCS is aware of youths' immigration-related needs, and despite DCS's own acknowledgement of the importance of SIJS, DCS routinely fails to seek SIJS on behalf of eligible youth. In some cases, DCS takes actions that harm youths' immigration cases.

115. DCS lacks policies or procedures to ensure that eligible youth obtain SIJS Predicate Orders from Tennessee courts.

116. DCS also lacks policies or procedures to ensure that youth who have obtained a SIJS Predicate Order are able to file SIJS petitions with USCIS.

117. Even when notified about immigration concerns by adult advocates, DCS often takes no action. Adults such as Court Appointed Special Advocates (CASAs), guardians ad litem, foster parents, mental health service providers, immigration lawyers, or family members frequently reach out to DCS to notify DCS of a youth's immigration legal needs but receive no reply. Attorneys from AIR have, in some cases, contacted DCS repeatedly about the necessary steps to obtain SIJS for a child in DCS custody without receiving a response from DCS for over a year.

27

118.    By virtue of being in DCS custody, these youth do not have access to other adults to help them file for SIJS.

119.    Immigration attorneys working pro bono attempt to fill the gap in legal assistance, but do not have the capacity to support all of the children in DCS custody in need of immigration legal services. Adding to immigration attorneys' difficulty, DCS refuses to compensate attorneys who provide necessary immigration legal services to children in its custody, including AIR.

120.    DCS takes other steps that harm a child's chances of obtaining SIJS. DCS routinely fails to provide essential documents, such as birth certificates, to pro bono attorneys working to secure SIJS for youth in DCS custody, despite multiple requests. Upon information and belief, youth in DCS custody have limited, if any, ability to obtain essential documents elsewhere. Without these documents, youth and their attorneys are unable to file SIJS applications.

121.    DCS also routinely fails to assist with obtaining medical examinations legally required to be conducted as part of a youth's permanent residency application.

122.    On information and belief, DCS has no policies or procedures to ensure that youth are transported to immigration court for necessary hearings, even though many youth in DCS custody have no other way to attend, or even know that they need to attend, these hearings.

123.    Failure to attend an immigration court hearing can result in an order of removal issued against a child in absentia.

124.    DCS has the technical capabilities to regularly track this information—it simply chooses not to do so. This failure seriously impacts children throughout Tennessee. In 2023, upon request, DCS was able to determine that 99 youth in DCS custody, spread across 25 Tennessee counties, had no lawful immigration status as of October 30, 2022. Further, DCS was

able to determine that 35 youth had exited DCS custody without lawful immigration status between November 1, 2021 and October 31, 2022 due to reaching the age of 18. All of these youth permanently lost the opportunity to apply for SIJS. These youth had spent an average of 13 months in DCS's care, with several children spending *years* in custody before aging out.

## IV. DCS's Actions and Inactions Seriously Harm Plaintiffs.

### A. DCS's actions and inactions seriously harm children in the Class.

125.     As a result of the failures alleged above, DCS puts SIJS-eligible youth at risk of losing their chance to apply for SIJS relief before aging out of custody, failing to appear at scheduled immigration court hearings, failing to collect essential materials to support an application for immigration relief, and failing to obtain access to critical services and benefits as they transition to adulthood.

126.     DCS's failures seriously harm youth in the Class, who face the constant risk of being detained and ordered deported after aging out of foster care without obtaining SIJS. The constant fear of deportation only further compounds the traumas these youth have already experienced by virtue of lacking legal immigration status and being in the foster care system, risking further harm to their emotional and mental health.

127.     Youth who age out of foster care without obtaining SIJS lose out on their most promising pathway to lawful employment. Without the ability to work lawfully, these youth risk being unable to transition to independent adulthood. Lack of access to most public benefits further exacerbates the difficulty in obtaining basic necessities, such as food and stable housing. As a result, youth unable to obtain SIJS face poverty, exploitation, dependency on abusive adults, and limited socioeconomic mobility—the harms SIJS was created to avoid.

128.     The inability to access federal financial aid for higher education further risks thwarting the successful transition to adulthood for youth who age out of foster care without

obtaining SIJS. Youth without legal status in Tennessee cannot access in-state college tuition, state financial aid, professional or occupational licensure, or drivers' licenses or other state identification.

129.    A lack of stable employment and housing also puts youth at risk of having their own children removed by DCS. SIJS-eligible youth in DCS's custody are therefore at greater risk of facing the trauma of having their own family torn apart a second time and being further caught in the foster care system.

130.    Without SIJS, youth do not have the opportunity to apply for extended foster care and must face all of these challenges alone as soon as they turn 18, even if they would have otherwise qualified for and pursued extended foster care benefits.

131.    The fear of deportation, the stresses of being involved in the immigration system, and the lack of access to most medical coverage negatively impacts the physical health of youth without legal status as well.

132.    If ultimately deported, these youth face even graver risks of being removed to a country where they lack family or community connections, and potentially face dangerous conditions.

133.    By failing to meet the needs of SIJS-eligible youth, DCS exacerbates all of these serious risks, undermining the goals of the child welfare system: safety, permanency, and well-being.

### B.  DCS's actions and inactions harm AIR.

134.    As a result of the failures alleged above, DCS also forces AIR to divert its limited resources to address the immigration-related needs of SIJS-eligible youth in DCS custody. Resources spent addressing foster youths' immigration-related needs harms AIR's ability to work on the removal defense cases that are the primary focus of the organization.

135. Because of DCS's lack of policies and procedures, belated and ineffective planning, and lack of case manager training, AIR often learns about a youth's immigration-related needs when those needs are very urgent. AIR therefore is forced to divert its resources away from other active matters on an urgent and unpredictable basis to provide necessary legal aid to youth in DCS custody.

136. Even when AIR learns about the urgent immigration-related needs of youth in DCS custody and determines it can provide legal assistance, DCS routinely fails to provide AIR with necessary information or documents, resulting in lengthy delays in highly time-sensitive cases. AIR is forced to expend additional resources by repeatedly contacting DCS to obtain materials and services needed for preparing a SIJS application, such as essential documents and transportation. The amount of AIR staff time spent on applications for children in DCS custody is therefore higher than the amount of time required to represent other SIJS-eligible children.

137. AIR must further divert resources from its regular work to assist DCS case managers who, without adequate training, repeatedly ask AIR staff the same basic questions about immigration cases. In AIR's experience, there is no official point of contact at DCS regarding foster youths' immigration cases. Instead, AIR staff must expend AIR's resources dealing with multiple DCS representatives for each case, spending time to explain the same issues to each new DCS representative they encounter. Diverting resources from other cases risks harming AIR's other vulnerable clients.

138. AIR staff have significant difficulty arranging necessary appointments with their clients in DCS custody because of delays or unresponsiveness by DCS.

139.    DCS has not compensated AIR or its attorneys for immigration legal services provided to youth in its custody. Accepting unfunded cases for pro bono representation on the scale that DCS requires simply is not possible for AIR.

140.    DCS's actions and inactions harm AIR's ability to serve SIJS-eligible youth and other clients with urgent immigration-related needs. All of this implicates AIR's ability to meet its performance requirements, putting its ability to maintain grants and obtain future funding support in jeopardy.

## CLASS ALLEGATIONS

141.    Named Plaintiffs B.R., L.T., and A.B. bring this action as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated youth.

142.    This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

143.    Plaintiffs bring this action on behalf of themselves and the following Class for injunctive relief, based on violations of the Fourteenth Amendment of the United States Constitution, as applied through 42 U.S.C. § 1983: All immigrant children under the age of 18 in DCS custody who are eligible to apply for SIJS. Named Plaintiffs are members of and represent this Class.

144.    The deficiencies in the care and services provided to children without legal status described above, and the resulting risks to the children in the Class, arise from Defendant's policies, procedures, patterns, and/or practices, including the following:

    a.    Defendant's failure to consider children's critical immigration-related needs in DCS's policies and procedures;

32

       b.      Defendant's failure to train case managers to understand immigration issues facing youth in their care; and

       c.      Defendant's failure to ensure eligible youth are able to apply for SIJS.

145.    As a result, the children in the Class are subject to serious harm and risk, including the following:

       a.   Their immigration-related needs are not identified in a timely manner;

       b.   They are unable to take steps to secure lawful status to which they are entitled because their access to documents, legal resources, and transportation is controlled and limited by DCS;

       c.   As a result of aging out of DCS custody without immigration documentation, they are unable to work lawfully or obtain public benefits to which they would otherwise be entitled; and

       d.   They are under constant threat of detention and removal to unsafe conditions and the resulting separation from their families and communities in the United States.

146.    The Class is sufficiently numerous to make joinder impracticable. The exact number of members of the proposed Class is unknown and not available to Plaintiffs at this time, but as of October 30, 2022, there were 99 children without legal status in DCS custody of whom DCS was aware. The true number of children without legal status is likely higher because DCS does not reliably verify children's immigration status. Other factors that make joinder impracticable include the fluid nature of the Class, the geographically diverse Class members, the limited financial resources of Class members, the unknown identity of future Class members, and Defendant's discretion with respect to service provision and placement decisions.

147.     Numerous questions of fact and law are common to the claims of Named Plaintiffs and members of the proposed Class, including a) whether Defendant's failure to have policies and procedures for addressing children's critical immigration-related needs violates the Fourteenth Amendment as applied through 42 U.S.C. § 1983, b) whether DCS's failure to ensure eligible youth are able to apply for SIJS violates the Fourteenth Amendment as applied through 42 U.S.C. § 1983; and c) whether Named Plaintiffs and the Class members are entitled to declaratory and injunctive relief to vindicate their constitutional rights.

148.     The claims that Named Plaintiffs raise are typical of those of the Class, as each Class member's claim would arise from the same course of events, and each Class member would make similar legal arguments to prove Defendant's liability. The remedies sought by Named Plaintiffs are the same remedies that would benefit the Class: an injunction requiring Defendant to establish and implement policies and procedures to ensure immigrant children in DCS custody receive the benefit of planning for immigration-related needs and transitional services, adequate training on immigration issues for case managers, and timely submission of SIJS applications.

149.     Named Plaintiffs will fairly and adequately represent the interests of the Class. There are no conflicts among the Named Plaintiffs and any members of the Class. The Next Friends are dedicated to representing the best interests of the Named Plaintiffs.

150.     The undersigned counsel have extensive experience in litigating civil rights and class action lawsuits, including those involving the rights of children in foster care and immigrants lacking legal status.

151.     Defendant has acted or refused to act on grounds that are generally applicable to the Class, and injunctive and declaratory relief are appropriate for the Class as a whole.

## CLAIM FOR RELIEF

### FIRST CAUSE OF ACTION
**(Violations of 42 U.S.C. § 1983 by Depriving Plaintiffs of Their Fourteenth Amendment Procedural Due Process Right to Timely Submission and Adjudication of SIJS Applications - Asserted on Behalf of the Named Plaintiffs, Putative Class, and AIR)**

152.    Plaintiffs incorporate each and every allegation of the Complaint as if fully set forth below.

153.    The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits Defendant from depriving any person of life, liberty, or property without due process of law.

154.    Named Plaintiffs and other members of the Class have a property interest, protected by the Due Process Clause, in applying for immigration benefits for which they are eligible, including SIJS, and in the timely adjudication of their applications for SIJS.

155.    The foregoing actions and inactions of Defendant in her official capacity constitute policies, patterns, practices, and/or customs that deprive Named Plaintiffs and members of the Class of this property interest without due process of law. Defendant's actions and inactions prevent members of the Class from timely seeking SIJS, including by timely seeking predicate orders, and submitting timely SIJS applications and supporting materials. Defendant's actions and inactions result in members of the Class permanently losing their chance to obtain SIJS benefits without due process to determine their entitlement to SIJS.

156.    Defendant's acts and omissions described above violate 42 U.S.C. § 1983 by depriving the Named Plaintiffs and the members of the Class of their constitutional rights.

157.    Defendant's unlawful acts and omissions have caused and will continue to cause AIR to expend resources to respond rapidly and with minimal warning to urgent immigration-related needs that Defendant should have identified and planned for, including by AIR assisting

35

youth in seeking SIJS and obtaining from DCS materials and services necessary for SIJS applications.

## **PRAYER FOR RELIEF**

158.     WHEREFORE, Plaintiffs respectfully request that the Court:

a.     Assert subject matter jurisdiction over this action;

b.     Order that the Named Plaintiffs may maintain this action as a class action pursuant to Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure and appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

c.     Declare unlawful, pursuant to Rule 57 of the Federal Rules of Civil Procedure, Defendant's conduct as alleged herein as a violation of the rights of Plaintiffs and the Class members under 42 U.S.C. § 1983;

d.     Grant preliminary and/or permanent injunctive relief requiring Defendant to:

i.     Establish and implement policies and procedures to ensure that children in DCS custody receive the benefit of support and planning for immigration-related needs and transitional services;

ii.     Establish and implement policies and procedures to ensure that DCS case managers receive adequate training on immigration issues impacting youth in DCS's care;

iii.     Establish and implement policies and procedures to ensure eligible youth are able to seek SIJS and other immigration relief in a timely manner;

36

iv.        Establish and implement policies and procedures to address the needs of youth facing potential removal; and

v.        Establish and implement policies and procedures to ensure DCS does not otherwise obstruct Class members from pursuing immigration relief.

e.        Retain jurisdiction over Defendant until such time as the Court is satisfied that Defendant has implemented and sustained this injunctive relief;

f.        Award reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

g.        Grant such other relief as the Court may deem just and proper.

*       *       *

Dated: July 21, 2023

Respectfully submitted,


___/s Paige Waldrop Mills_____
BASS, BERRY & SIMS PLC
Paige Waldrop Mills (BPR 016218)
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Phone: (615) 742-6200
Fax: (615) 742-6293
pmills@bassberry.com

CHILDREN'S RIGHTS
Leecia Welch (*pro hac vice* forthcoming)
Nicole Taykhman (*pro hac vice* forthcoming)
Stephen Dixon (*pro hac vice* forthcoming)
Katrina Braun (*pro hac vice* forthcoming)
88 Pine Street, Suite 800
New York, NY 10005
Phone: (212) 683-2210
Fax: (212) 683-4015
lwelch@childrensrights.org
ntaykhman@childrensrights.org
sdixon@childrensrights.org
kbraun@childrensrights.org

MCDERMOTT WILL & EMERY LLP
Paul M. Thompson (*pro hac vice* forthcoming)
Sam C. Neel (*pro hac vice* forthcoming)
Irene A. Firippis (*pro hac vice* forthcoming)
The McDermott Building
500 North Capitol Street, N.W.
Washington, DC 20001
Phone: (202) 756-8032
pthompson@mwe.com
sneel@mwe.com
ifirippis@mwe.com

MCDERMOTT WILL & EMERY LLP
Rodney D. Swartz (*pro hac vice* forthcoming)
650 Live Oak Avenue, Suite 300
Menlo Park, CA 94025-4885
Phone: (650) 815-7400
rswartz@mwe.com


**ATTORNEYS FOR PLAINTIFFS**